SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| DEWAYNE McQUEEN, Individually and on behalf of a Class of All Others Similarly Situated, and RAY CEDENO, Individually and on behalf of a Class of All Others Similarly Situated, | Index No.: 509993/2020<br>Filed: 6/15/2020 |
| **Plaintiffs,** | **SUMMONS** |
| | Plaintiff designates Kings County as the place of trial |
| -against | Basis of venue is the Residence of Plaintiff DeWayne McQueen |
| THE CITY OF NEW YORK, POLICE COMMISSIONER DERMOT SHEA, Individually and in his Official Capacity, POLICE OFFICER PETER RUOTOLO, Individually and in his Official Capacity, POLICE OFFICER OMAR ELTABIB, Individually and in his Official Capacity, and NEW YORK CITY POLICE OFFICERS JOHN AND JANE DOES, | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

To the above-named Defendant(s):

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a Notice of Appearance, on the plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the state of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Garden City, New York
          June 15, 2020

                              BARKET EPSTEIN KEARON ALDEA
                              & LOTURCO, LLP


                    By:        /s/ Alexander Klein
                              Alexander Klein, Esq.
                              666 Old Country Road, Suite 700
                              Garden City, New York 11530
                              (516) 745-1500

**Defendants' Address:**

The City of New York
New York City Law Department
Office of Corporation Counsel
100 Church Street
New York, NY 10007

Dermot Shea - Police Commissioner
New York City Police Department
One Police Plaza
New York, New York 10038

Peter Ruotolo
New York City Police Department
One Police Plaza
New York, New York 10038

Omar Eltabib
New York City Police Department
One Police Plaza
New York, New York 10038

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| DEWAYNE McQUEEN, Individually and on behalf of a Class of All Others Similarly Situated, and RAY CEDENO, Individually and on behalf of a Class of All Others Similarly Situated, | COMPLAINT |
| Plaintiffs, | |
| -against | Index No.:  509993/2020 |
| THE CITY OF NEW YORK, POLICE COMMISSIONER DERMOT SHEA, Individually and in his Official Capacity, POLICE OFFICER PETER RUOTOLO, Individually and in his Official Capacity, POLICE OFFICER OMAR ELTABIB, Individually and in his Official Capacity, and NEW YORK CITY POLICE OFFICERS JOHN AND JANE DOES, | |
| Defendants. | |

The Plaintiffs, DeWayne McQueen and Ray Cedeno, individually and on behalf of a class of all others similarly situated (the "Class"), and complaining of the defendants through his attorney Alexander Klein, Esq., of Barket Epstein Kearon Aldea & LoTurco, LLP, respectfully allege that they and the Class were injured and suffered damages as a result of a practice among police officers with the New York City Police Department of ignoring landmark legislation that reformed bail practices in New York State, refusing to offer Desk Appearance Tickets—and instead detaining suspects pending arraignments—in cases where such detention is wrongful under the express terms of the new legislation.  This action seeks redress for the violation of state and federal civil rights of all members of the Class.

3

## INTRODUCTION

1.     In April 2019, New York State passed landmark legislation that reformed the mechanisms through which people accused of crimes may be detained or imprisoned before they have been convicted of any crimes.  This legislation—"Bail Reform"—prohibits pretrial detention in a wide variety of cases, for a wide variety of defendants, regardless of the accused's character, creed, or color.  In the process, the Bail Reform legislation reduces the scourge of jailing people simply because they are poor; it prevents innocent people from pleading guilty just to avoid our local jails; it alleviates our overcrowded detention system; and, above all, it helps secure the fundamental guarantee that criminal suspects are presumed innocent until proven guilty.

2.     One pillar of our Bail Reform legislation is a requirement that police release certain criminal suspects with a Desk Appearance Ticket (a "DAT") rather than detaining them pending an arraignment.  This requirement saves scores of defendants, including first-time offenders, from the nightmare experience of spending days or even nights locked in precincts or, worse, in notorious jails like Bronx Central Booking or Manhattan's "Tombs."  And within this corner of the Bail Reform legislation is a set of rules for those charged with driving under the influence of alcohol: Bail Reform permits the detention-pending-arraignment of anyone who refuses to take a breath test, or who has a blood alcohol content of 0.08 percent or above; but for the collection of people whose blood alcohol content is below 0.08 percent, New York law now requires a simple DAT rather than detention.

3.     This case is about that group of people who have been charged with driving under the influence of alcohol and who have demonstrated a blood alcohol content of less than 0.08 percent.  Despite the new rules of Bail Reform, a large population of this group has nevertheless been arrested and imprisoned in precincts and jails across the five boroughs by the New York City

Police Department. This practice of false imprisonment violates express statutory law of New York State, and it violates the Due Process rights of its victims. To redress the damages suffered by this class, and to vindicate the public interest in having local law enforcement faithfully execute this landmark legislation, DeWayne McQueen and the class he represents seek monetary damages to redress the harms suffered because of this illegal conduct, and an injunction against this conduct's continuation.

## PARTIES

4.      DeWayne McQueen resides in Kings County, New York, and was detained in violation of express statutory provisions recognized under New York's landmark Bail Reform legislation.

5.      Ray Cedeno resides in Bergen County, New Jersey, where he is a registered nurse on the front-lines in the fight against COVID-19; he was detained in violation of express statutory provisions recognized under New York's landmark Bail Reform legislation.

6.      All other members of the Class were detained in violation of express statutory provisions recognized under New York's landmark Bail Reform legislation.

7.      The City of New York is a municipality duly organized and existing under the laws of the State of New York, and it employs all of the named Defendants and John Does in this action.

8.      Defendant Dermot Shea was and is the Commissioner of the New York City Police Department, having been sworn in on December 2, 2019. At all relevant times he has acted under color of New York State law. He is sued here in his official and personal capacities.

9.      Defendant Peter Ruotolo has at all relevant times been an officer in the New York City Police Department, an employee of the City of New York, acting under color of state law

5

within the scope of his city employment. He is sued here in his official and personal capacities, and was the arresting officer of Plaintiff McQueen.

10.    Defendant Omar Eltabib has at all relevant times been an officer in the New York City Police Department, an employee of the City of New York, acting under color of state law within the scope of his city employment. He is sued here in his official and personal capacities, and was the arresting officer of Plaintiff Cedeno.

11.    The John and Jane Doe defendant officers have at all relevant times been officers in the New York City Police Department, employees of the City of New York, acting under color of state law within the scope of their city employments. They are the officers responsible for detaining all other members of the Class despite express statutory law requiring their release with a DAT.

## BACKGROUND

### Statutory Framework Common to All Members of the Class

12.    On April 19, 2019, New York State passed legislation reforming the rules that govern pretrial detention for criminal suspects in our state ("Bail Reform").

13.    Bail Reform became effective on January 1, 2020.[1]

14.    Among other things, Bail Reform broadened the scope of cases for which police officers must issue Desk Appearance Tickets ("DATs") rather than detaining them pending arraignment.

15.    Under Criminal Procedure Law §150.20(a), when a police officer may arrest a suspect without a warrant—and subject to exceptions for felonies and certain sex offenses,

---

[1] The Bail Reform legislation was amended in April 2020, but these amendments have no bearing on the claims by the class members in this action.

offenses related to escapes, and bail jumping—the officer "**shall, except as set out in paragraph (b) of this subdivision, subject to the provisions of subdivisions three and four of section 150.40 of this title, instead issue to and serve upon such person an appearance ticket**" (emphasis added).

16.     An exception to this rule set forth in "paragraph (b) of this subdivision" is that a police officer is "not required to issue an appearance ticket if[] ... the person is charged with a crime for which the court may suspend or revoke his or her driver license[.]" *See* CPL § 150.20(b)(vii).

17.     New York law permits courts to suspend or revoke a defendant's driving privileges upon an arrest, pending prosecution, for certain offenses related to driving under the influence of alcohol ("DUI").

18.     However, outside of cases in which a motorist refuses to give a breath (or blood) sample,[2] the authority to issue suspensions-pending-prosecution is limited to matters in which the "person charged ..., at the time of arrest, is alleged to have had .08 of one percent or more by weight of alcohol in such driver's blood as shown by chemical analysis of blood, breath, urine or saliva...." *See* VTL §1193(2)(e)(7).

19.     Thus, a simple rule emerges in (i) DUI cases where (ii) a motorist allows police to measure his or her blood-alcohol-content, and (iii) that blood-alcohol-content measures less than 0.08 percent (together, "Relevant DUI Cases"): the charges do not allow courts pending

---

[2] When a motorist is arrested and charged with a violation of VTL Section §1192 (a DUI offense) police officers commonly request that the motorist provide a sample of breath, blood, urine or saliva for testing to determine the presence or absence of alcohol in the blood. The most common method used is a breath test. If a person refuses to submit to a test under certain statutory proscribed conditions the court can suspend a motorist's license at the time of the arraignment even in the absence of a conviction. This is referred to as a pre-conviction suspension.

prosecution to "suspend or revoke his or her driver license"[3] and, instead, police simply "shall ... issue to and serve upon such person an appearance ticket." *See* CPL §150.20(a).

**DeWayne McQueen presents a Relevant DUI Case, Requiring a Desk Appearance Ticket.**

20.    At approximately 3:40am on January 11, 2020, Bail Reform had been in effect for more than a week.

21.    At approximately 3:40am on January 11, 2020, DeWayne McQueen ("Mr. McQueen") was in a motor vehicle stopped by police.

22.    At approximately 3:40am on January 11, 2020, Defendant Ruotolo stopped Mr. McQueen in the vicinity of 251 West 19th Street, in Manhattan.

23.    Mr. McQueen had not been in a car accident.

24.    At approximately 4:02am on January 11, 2020, Defendant Ruotolo arrested Mr. McQueen on suspicion of driving under the influence of alcohol.

25.    This was Mr. McQueen's first arrest.

26.    Defendant Ruotolo took Mr. McQueen to the Seventh Precinct, located at 19 ½ Pitt Street, in Manhattan.

27.    At the Seventh Precinct, Defendant Ruotolo asked Mr. McQueen whether he would consent to a breath test to measure his blood alcohol content.

28.    After initially refusing, Mr. McQueen consented to letting Defendant Ruotolo measure his blood alcohol content.

29.    At approximately 4:42am, Defendant Ruotolo measured Mr. McQueen's blood alcohol content.

---

[3] See CPL §150.20(b)(vii).

30.    To measure Mr. McQueen's blood alcohol content, Defendant Ruotolo used a CMI Intoxilyzer 9000.

31.    The CMI Intoxilyzer 9000 measured Mr. McQueen's blood alcohol content to be 0.07 percent.[4]

32.    The CMI Intoxilyzer 9000 measured Mr. McQueen's blood alcohol content to be less than 0.08 percent.

33.    Under New York law, Defendant Ruotolo was required to issue Mr. McQueen a DAT.

**Instead of Issuing a DAT, Defendant Ruotolo takes Mr. McQueen down to The Tombs.**

34.    After the CMI Intoxilyzer 9000 measured Mr. McQueen's blood alcohol content below 0.08 percent, Defendant Ruotolo did not release Mr. McQueen with a DAT.

35.    After the CMI Intoxilyzer 9000 measured Mr. McQueen's blood alcohol content below 0.08 percent, Defendant Ruotolo put Mr. McQueen into a holding cell in the Seventh Precinct.

36.    Mr. McQueen was kept in the Seventh Precinct holding cell for approximately two hours.

37.    On January 11, 2020, Defendant Ruotolo took Mr. McQueen to the Manhattan Detention Complex.

---

[4] 10 NYCRR 59.4(e) provides that the "results of an analysis of breath for alcohol shall be expressed in terms of percent weight per volume, to the second decimal place as found; for example, 0.237 percent found shall be reported as 0.23 percent." Therefore, while the police department provided a reading to the third decimal point, this reading to the second decimal is the appropriate reflection of the blood alcohol content under New York law.

38.     On January 11, 2020, Defendant Ruotolo took Mr. McQueen to the Manhattan Detention Complex at approximately 7 o'clock in the morning.

39.     The Manhattan Detention Complex is known colloquially as the "Tombs."

40.     Mr. McQueen was held in a cell in the Tombs.

41.     Mr. McQueen shared the cell with at least twenty-five other inmates.

42.     Mr. McQueen was kept in the Tombs until approximately 11:59 pm on January 11, 2020.

43.     At approximately midnight on January 12, 2020, Mr. McQueen was taken out of his cell in the Tombs and taken to a nighttime arraignment.

44.     At approximately midnight on January 12, 2020, Mr. McQueen was taken to the New York County courthouse located at 100 Centre Street.

45.     At approximately 12:30 am on January 12, 2020, the criminal court released Mr. McQueen on his own recognizance.

46.     The criminal court did not issue a suspension of Mr. McQueen's license.

47.     When Mr. McQueen was released on his own recognizance, he had spent more than twenty hours in detention

48.     When Mr. McQueen was released on his own recognizance, he had spent more than nineteen hours in detention **after** his blood alcohol content was measured to be below 0.08 percent.

49.     When Mr. McQueen was released on his own recognizance, he had spent more than nineteen hours in detention beyond what the Bail Reform rules allowed.

50.     Mr. McQueen suffered loss of liberty as a consequence of the Defendants' actions.

51.     Mr. McQueen suffered, and continues to suffer from, emotional distress as a consequence of the Defendants' actions.

**Ray Cedeno Presents a Relevant DUI, Requiring a Desk Appearance Ticket**

52.     At approximately 12:17am on February 1, 2020, Bail Reform had been in effect for approximately a month.

53.     At approximately 12:17am on February 1, 2020, Ray Cedeno ("Mr. Cedeno") was in a motor vehicle stopped by police.

54.     At approximately 12:17am on February 1, 2020, Defendant Eltabib stopped Mr. Cedeno in the vicinity of West 168 Street and Riverside Drive, in Manhattan.

55.     Mr. Cedeno had not been in a car accident.

56.     At approximately 12:46am on February 1, 2020, Defendant Eltabib arrested Mr. Cedeno on suspicion of driving under the influence of alcohol.

57.     This was Mr. Cedeno's first arrest.

58.     Defendant Ruotolo took Mr. McQueen to the Seventh Precinct, located at 19 ½ Pitt Street, in Manhattan.

59.     At the Twenty-Eighth Precinct, Defendant Eltabib asked Mr. Cedeno whether he would consent to a breath test to measure his blood alcohol content.

60.     Mr. Cedeno consented to letting Defendant Eltabib measure his blood alcohol content.

61.     At approximately 1:24am, Defendant Eltabib measured Mr. Cedeno's blood alcohol content.

62.     To measure Mr. Cedeno's blood alcohol content, Defendant Eltabib used a CMI Intoxilyzer 9000.

63.     The CMI Intoxilyzer 9000 measured Mr. Cedeno's blood alcohol content to be 0.07 percent.[5]

64.     The CMI Intoxilyzer 9000 measured Mr. Cedeno's blood alcohol content to be less than 0.08 percent.

65.     Under New York law, Defendant Eltabib was required to issue Mr. Cedeno a DAT.

**Instead of Issuing a DAT, Defendant Eltabib takes Mr. Cedeno down to The Tombs.**

66.     After the CMI Intoxilyzer 9000 measured Mr. Cedeno's blood alcohol content below 0.08 percent, Defendant Eltabib did not release Mr. Cedeno with a DAT.

67.     After the CMI Intoxilyzer 9000 measured Mr. Cedeno's blood alcohol content below 0.08 percent, Defendant Eltabib put Mr. Cedeno into a holding cell in the 28th Precinct.

68.     Mr. Cedeno was kept in the 28th Precinct holding cell for approximately two hours.

69.     On February 1, 2020, Defendant Eltabib took Mr. Cedeno to the Tombs.

70.     On February 1, 2020, Defendant Eltabib took Mr. Cedeno to the Tombs at approximately 2:30am.

71.     Mr. Cedeno was held in a cell in the Tombs.

72.     Mr. Cedeno shared the cell with at least twenty other inmates.

73.     Mr. Cedeno was kept in the Tombs until approximately midnight the following day.

74.     At or approaching midnight on February 1, 2020, Mr. Cedeno was taken out of his cell in the Tombs and taken to an arraignment.

75.     At or approaching midnight on February 1, 2020, Mr. Cedeno was taken to the New York County courthouse located at 100 Centre Street.

---

[5] As per 10 NYCRR 59.4(e), and as stated above, the police department reported the blood alcohol content to the third decimal point, but the reflection here to the second decimal point is in accordance with New York law.

76.    Approximately an hour after arriving at 100 Centre Street, the criminal court released Mr. Cedeno on his own recognizance.

77.    The criminal court did not issue a suspension of Mr. Cedeno's license.

78.    When Mr. Cedeno was released on his own recognizance, he had spent more than 24 hours in detention

79.    When Mr. Cedeno was released on his own recognizance, he had spent more than 24 hours in detention **after** his blood alcohol content was measured to be below 0.08 percent.

80.    When Mr. Cedeno was released on his own recognizance, he had spent more than 24 hours in detention beyond what the Bail Reform rules allowed.

81.    Mr. Cedeno suffered loss of liberty as a consequence of the Defendants' actions.

82.    Mr. Cedeno suffered, and continues to suffer from, emotional distress as a consequence of the Defendants' actions.

## CLASS ACTION ALLEGATIONS

83.    The Class in this action consists of people who presented Relevant DUI Cases but were not issued DATs.

84.    On information and belief, since Bail Reform became effective on January 1, 2020, the criminal defendants who were not issued DATs even though they presented Relevant DUI Cases (the "Class") already numbers in the many hundreds, if not thousands.

85.    The Class is so numerous that joinder of all members is impracticable.

86.    A common question of law predominates over all members of the Class: namely, whether police may refuse to issue DATs to criminal suspects who present Relevant DUI Cases.

87.    A common fact pattern predominates over all members of the Class:  namely, all members were criminal suspects presenting Relevant DUI Cases who were nevertheless detained without a DAT.

88.    Mr. McQueen and Mr. Cedeno's claims are typical of the claims of the other members of the Class:  namely, they and all Class-members were subjected to a wrongful imprisonment under New York law, were detained until they were arraigned despite statutory law requiring their release with a DAT, and were subject to a violation of their state and federal rights to Due Process.

89.    Mr. McQueen and Mr. Cedeno will fairly and adequately protect the interests of the Class:  they have hired competent counsel at Barket Epstein Kearon Aldea & LoTurco, LLP ("BEKAL") to represent their interests and those of the Class, a firm which, for the sake of this action, is combining its division on vehicular crime with its division on civil rights litigation.[6]

90.    A class action is a superior vehicle to other available methods for the fair and efficient adjudication of the Class members' claims.

91.    By combining resources and presenting the action as a Class, the Plaintiffs demonstrate the widespread problem presented by the Defendants' conduct and the public interest that this action seeks to vindicate.

92.    This case seeks to vindicate the public interest in requiring the NYPD to faithfully execute the landmark Bail Reform legislation.

---

[6] BEKAL's division on vehicular crime is led by Steven Epstein, one of the most well known vehicular crimes attorneys in the Country; and BEKAL's division on civil rights litigation has been involved in several high profile actions and claims against municipalities across the state—including, for example, Martin Tankleff v. County of Suffolk, et al., and Christopher Loeb v. James Burke, et al.  Additional counsel on this action, Seymour James, has vast experience with the criminal defense issues associated with this action.  Until joining BEKAL, he was the head of the Legal Aid Society in New York City.

93.     This case seeks to vindicate the public interest in saving presumptively innocent criminal suspects from being detained for days and sometimes nights pending an arraignment—a public interest that New York now recognizes through the Bail Reform legislation.

94.     Brought as a Class seeking to vindicate a public interest, the action excuses members of the Class from the ordinary time-consuming and resource-draining requirements of filing notices of claims and answering questions at a 50-H examination. *See, e.g., Mills v. Monroe Cty.*, 59 N.Y.2d 307, 311 (1983). These claims and examinations are particularly inappropriate in this matter, as the questions of fact and law that will govern liability in this action are readily apparent from the face of this complaint.

95.     Defendants are liable to the Class in an amount to be determined by a jury, but in excess of all jurisdictional limits on lower courts.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION: STATE LAW WRONGUL DETENTION[7]
AS AGAINST DEFENDANTS RUOTOLO, ELTABIB, and JOHN AND JANE DOES**

96.  Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

97.  Defendants Ruotolo, Eltabib, and the John and Jane Joes intended to confine Mr. McQueen, Mr. Cedeno, and the members of the Class, respectively.

98.  Defendants Ruotolo, Eltabib, and the John and Jane Joes intended to detain Mr. McQueen, Mr. Cedeno, and the members of the Class, respectively.

99.  Mr. McQueen, Mr. Cedeno, and the members of the Class were conscious of their confinement.

100. Mr. McQueen, Mr. Cedeno, and the members of the Class were conscious of their detention.

101. Mr. McQueen, Mr. Cedeno, and the members of the Class did not consent to their confinement.

102. Mr. McQueen, Mr. Cedeno, and the members of the Class did not consent to their detention.

103. The confinement was not otherwise privileged.

104. The detention was not otherwise privileged.

105. The detention violated statutory law.

---

[7] These pleadings use the term "Wrongful Detention" as opposed to False Arrest or False Imprisonment, as, unlike these more traditional labels, the claim does not hinge upon whether the police had probable cause to arrest the subjects.  Under the Bail Reform legislation, the wrongful act was the detention regardless of whether the police had probable cause.  *See, e.g., Marchand v. Simonson*, 16 F. Supp.3d 97, 110 (D. Conn. 2014) (where state has passed legislation prohibiting an arrest under certain circumstances—there, for minor traffic violations—probable cause for the offense is not a defense; "the Court must find that Simonson did not have probable cause to arrest Marchand … as custodial arrest for this infraction is not permitted under Connecticut law").

106.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered damages.

107.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered loss of liberty.

108.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered emotional distress.

109.    The Defendants are liable for attorneys' fees under CPLR 909.

**SECOND CAUSE OF ACTION:  RESPONDEAT SUPERIOR
AS AGAINST THE CITY OF NEW YORK**

110.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

111.    Defendant City of New York was at all relevant times the employer for Defendants Ruotolo, Eltabib, and the John and Jane Does.

112.    At all relevant times, Defendants Ruotolo, Eltabib, and the John and Jane Does were acting within the scope of their employment.

113.    At all relevant times, Defendants Ruotolo, Eltabib, and the John and Jane Does were acting with the Defendant City's assent, for its benefit, and under its control.

114.    At all relevant times, Defendants Ruotolo, Eltabib, and the John and Jane Does were wearing the uniform associated with their City of New York employment.

115.    Defendant City of New York is liable for the named Defendants' acts of state law wrongful detention pursuant to *respondeat superior*.

116.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered damages.

117.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered loss of liberty.

118.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered emotional distress.

119.    The Defendants are liable for attorneys' fees under CPLR 909.

**THIRD CAUSE OF ACTION:  DEPRIVATION OF DUE PROCESS (STATE LAW) AS AGAINST DEFENDANTS RUOTOLO, ELTABIB, and JOHN AND JANE DOES**

120.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

121.    Mr. McQueen, Mr. Cedeno, and the members of the Class had a liberty interest against being forcibly detained pending their arraignments in criminal court.

122.    State law, pursuant to Bail Reform, delineates the "process" that is "due" in cases presenting a Relevant DUI:  the suspect must be released with a DAT rather than detained pending an arraignment.

123.    Despite the liberty interest, and despite state law, Mr. McQueen, Mr. Cedeno, and the members of the Class were all deprived of their freedom pending their arraignments.

124.    Despite the liberty interest, and despite state law, Mr. McQueen, Mr. Cedeno, and the members of the Class were all deprived of their due process.

125.    Despite the liberty interest, and despite state law, Mr. McQueen, Mr. Cedeno, and the members of the Class were all deprived of their rights protected under the New York State Constitution, Article I Section 6 ("No person shall be deprived of … liberty … without due process of law").

126.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered damages.

127.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered loss of liberty.

128.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered emotional distress.

129.    The Defendants are liable for attorneys' fees under CPLR 909.

**FOURTH CAUSE OF ACTION:  WRONGFUL DETENTION UNDER 42 U.S.C. 1983 AS AGAINST DEFENDANTS RUOTOLO, ELTABIB, and JOHN AND JANE DOES**

130.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

131.    Defendants Ruotolo, Eltabib, and the John and Jane Joes intended to confine Mr. McQueen, Mr. Cedeno, and the members of the Class, respectively.

132.    Defendants Ruotolo, Eltabib, and the John and Jane Joes intended to detain Mr. McQueen, Mr. Cedeno, and the members of the Class, respectively.

133.    Mr. McQueen, Mr. Cedeno, and the members of the Class were conscious of their confinement.

134.    Mr. McQueen, Mr. Cedeno, and the members of the Class were conscious of their detention.

135.    Mr. McQueen, Mr. Cedeno, and the members of the Class did not consent to their confinement.

136.    Mr. McQueen, Mr. Cedeno, and the members of the Class did not consent to their detention.

137.    The confinement was not otherwise privileged.

138.    The detention was not otherwise privileged.

139.    The detention violated statutory law.

140.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered damages.

141.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered loss of liberty.

142.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered emotional distress.

143.    Mr. McQueen, Mr. Cedeno, and the members of the Class are all entitled to attorneys' fees under 42 U.S.C. 1988(b).

144.    The Defendants are further liable for attorneys' fees under CPLR 909.

**FIFTH CAUSE OF ACTION:  DEPRIVATION OF DUE PROCESS (FEDERAL) AS AGAINST DEFENDANTS RUOTOLO, ELTABIB, and JOHN AND JANE DOES**

145.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

146.    Mr. McQueen, Mr. Cedeno, and the members of the Class had a liberty interest against being forcibly detained pending their arraignments in criminal court.

147.    The Bail Reform legislation delineates the "process" that is "due" in cases presenting a Relevant DUI:  the suspect must be released with a DAT rather than detained pending an arraignment.

148.    Despite the liberty interest, and despite the Bail Reform Legislation, Mr. McQueen, Mr. Cedeno, and the members of the Class were all deprived of their freedom pending their arraignments.

149.    Despite the liberty interest, and despite state law, Mr. McQueen, Mr. Cedeno, and the members of the Class were all deprived of their due process.

150.    Despite the liberty interest, and despite state law, Mr. McQueen, Mr. Cedeno, and the members of the Class were all deprived of their rights protected under the Fourteenth

Amendment to the United States Constitution ("Nor s hall any state deprive any person of ... liberty ... without due process of law").

151.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered damages.

152.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered loss of liberty.

153.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered emotional distress.

154.    Mr. McQueen, Mr. Cedeno, and the members of the Class are all entitled to attorneys' fees under 42 U.S.C. 1988(b).

155.    The Defendants are further liable for attorneys' fees under CPLR 909.

### SIXTH CAUSE OF ACTION: *MONELL* AS AGAINST THE CITY OF NEW YORK

156.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

157.    Defendant Shea, as Commissioner, knows to a moral certainty that officers in the NYPD will confront Relevant DUI cases.

158.    Relevant DUI cases present NYPD officers with a choice between issuing a detention pending arraignment versus issuing a DAT—a choice that proper training in the rules arising under the Bail Reform legislation would make less difficult.

159.    Making the wrong choice—detaining suspects in Relevant DUI cases—frequently, and indeed always, results in a deprivation of that suspect's constitutional rights to due process and against false arrest.

160.    Nevertheless, there has been a widespread failure to train officers in the NYPD that Relevant DUI cases must result in DATs rather than detentions pending arraignments.

161.    The widespread failure to train demonstrates a municipal policy and custom of showing deliberate indifference to the constitutional rights of Relevant DUI suspects and the public at large.

162.    This unconstitutional policy and custom caused the deprivation of rights suffered by Mr. McQueen, Mr. Cedeno, and all members of the Class—all of whom suffered loss of liberty and emotional distress.

163.    Mr. McQueen, Mr. Cedeno, and the members of the Class are all entitled to attorneys' fees under 42 U.S.C. 1988(b).

164.    The Defendants are further liable for attorneys' fees under CPLR 909.

165.    The Court should issue a permanent injunction barring the City of New York and its employees from continuing this practice of allowing Relevant DUI suspects to get detained pending their arraignments.

## SEVENTH CAUSE OF ACTION:  SUPERVISORY LIABILITY AS AGAINST DEFENDANT SHEA

166.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

167.    Defendant Shea has been Police Commissioner during all relevant times, including for the entire lifetime of the Bail Reform legislation.

168.    Indeed, Defendant Shea has been a vocal opponent to Bail Reform.  *See, e.g.,* Dermot Shea, *New York's New Bail Laws Harm Public Safety*, NYTIMES (Jan.23, 2020), available at:  https://www.nytimes.com/2020/01/23/opinion/shea-nypd-bail-reform.html.

169.    Defendant Shea has been personally involved in the violation of the Class members' state and constitutional rights.

170.    Despite his acute awareness of the new laws, he allowed the continuance of the NYPD custom of detaining Relevant DUI suspects pending an arraignment—contrary to Bail Reform requirements to release these people on a DAT.

171.    This failure has been so complete that, on information and belief, hundreds of suspects have been wrongfully detained by NYPD officers under Defendant Shea's supervision.

172.    Defendant Shea has been grossly negligent in supervising subordinates who have continued effectuating these detentions, which is how this illegal practice has become so widespread.

173.    The direct involvement of Defendant Shea caused the deprivation of rights suffered by Mr. McQueen, Mr. Cedeno, and all members of the Class—all of whom suffered loss of liberty and emotional distress.

174.    Mr. McQueen, Mr. Cedeno, and the members of the Class all suffered damages.

175.    Mr. McQueen, Mr. Cedeno, and the members of the Class are all entitled to attorneys' fees under 42 U.S.C. 1988(b).

176.    The Defendants are further liable for attorneys' fees under CPLR 909.

**EIGHTH CAUSE OF ACTION:  PERMAMENT INJUNCTION**
**AS AGAINST THE CITY OF NEW YORK AND DEFENDANT SHEA.**

177.    Plaintiffs re-allege each of the prior paragraphs alleged in this Complaint as though set forth again more fully herein.

178.    The Court should permanently enjoin the Defendant City and Commissioner Shea from continuing this unlawful and unconstitutional practice, which causes grievous harm to the public interest.

179.    Bail Reform was the result of a long-term and democratically decided clash over the public's interests surrounding the detention of people not yet convicted of any criminal offense.

180. Allowing the Defendants to violate the Bail Reform legislation so soon after its passage, as alleged herein, undermines the democratic values that allow for major legislative changes to take place.

181. Defendant Shea, as Commissioner, knows to a moral certainty that officers in the NYPD will confront Relevant DUI cases.

182. Relevant DUI cases present NYPD officers with a choice between issuing a detention pending arraignment versus issuing a DAT—a choice that proper training in the rules arising under the Bail Reform legislation would make less difficult.

183. Making the wrong choice—detaining suspects in Relevant DUI cases—frequently, and indeed always, results in a deprivation of that suspect's constitutional rights to due process and against false arrest.

184. Nevertheless, there has been a widespread failure to train officers in the NYPD that Relevant DUI cases must result in DATs rather than detentions pending arraignments.

185. The widespread failure to train demonstrates a municipal policy and custom of showing deliberate indifference to the constitutional rights of Relevant DUI suspects and the public at large.

186. This unconstitutional policy and custom caused the deprivation of rights suffered by Mr. McQueen, Mr. Cedeno, and all members of the Class—all of whom suffered loss of liberty and emotional distress.

187. Mr. McQueen, Mr. Cedeno, and the members of the Class are all entitled to attorneys' fees under 42 U.S.C. 1988(b).

188. The Defendants are further liable for attorneys' fees under CPLR 909.

189.    The Court should issue a permanent injunction barring the City of New York and its employees from continuing this practice of allowing Relevant DUI suspects to get detained pending their arraignments.

**WHEREFORE,** Plaintiffs pray for relief as follows:

A.    The Court should issue an order certifying this case as a class action, with the named Plaintiffs acting as representatives of the Class

B.    The Plaintiffs should be awarded compensatory damages against the Defendants in an amount to be determined at trial;

C.    They should be awarded punitive damages against the Defendants in an amount to be determined at trial;

D.    The Court should permanently enjoin the Defendants from continuing these illegal and unconstitutional practices.

E.    The Plaintiff should be awarded attorneys' fees pursuant to 42 U.S.C. 1988(b) and CPLR 909;

F.    Plaintiffs demand a trial by jury;

G.    The Court should award pre-judgment and post-judgment interest and recovery of Plaintiff's costs; and

H.    For any and all other relief to which the Plaintiffs may be entitled.

Dated: Garden City, New York
June 15, 2020

**BARKET EPSTEIN KEARON ALDEA
& LOTURCO, LLP**


_____/s/ Alexander Klein_____
Steven Epstein, Esq.
Seymour James, Esq.
Alexander R. Klein, Esq.
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 745-1500

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF** KINGS

-------------------------------------------------------------------x

DEWAYNE McQUEEN, et al.

Plaintiff/Petitioner,

- against -                                    Index No.509993-2020

THE CITY OF NEW YORK, et al.

Defendant/Respondent.

-------------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

2) You are a Defendant/Respondent (a party) in this case.

• **If you are represented by an attorney**:
Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

• **If you are not represented by an attorney**:
**You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

**If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

• serving and filing your documents electronically

• free access to view and print your e-filed documents

• limiting your number of trips to the courthouse

• paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

• visit: www.nycourts.gov/efile-unrepresented or
• contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated:  9/16/2020 ⊞

| | |
|---|---|
| Alexander R. Klein | 666 Old Coutry Road, Suite 700 |
| Name | |
| Barket Epstein Kearon Aldea & LoTurco, LLP | Garden City, New York 11530 |
| Firm Name | Address |
| | (516) 745-1500 |
| | Phone |
| | aklein@barketepstein.com ⊞ |
| | E-Mail |

To:    City of New York

Dermot Shea

Peter Ruotolo

Omar Eltabib

2/24/20